# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 16, 2011 Session

## STATE OF TENNESSEE v. FRED CHAD CLARK, II

**Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2067  Mark J. Fishburn, Judge**

---

**No. M2010-00570-CCA-R3-CD - Filed September 6, 2012**

---

The Defendant, Fred Chad Clark, II, was found guilty by a Davidson County Criminal Court jury of seven counts of rape of a child and two counts of aggravated sexual battery. See T.C.A. §§ 39-13-522 (Supp. 2005, 2006) (amended 2007, 2011) (rape of a child), -504 (2006) (aggravated sexual battery).  He was sentenced as a Range I offender to seventeen years for each rape of a child conviction and to ten years for each aggravated sexual battery conviction, to be served at 100% as a child rapist.  The trial court ordered partial consecutive sentencing, for an effective thirty-four year sentence.  On appeal, the Defendant contends that (1) the evidence is insufficient to support the convictions because the State failed to establish the corpus delicti; (2) there was a material variance between the proof and the State's election of offenses; (3) the trial court erred in admitting surreptitiously recorded conversations  he had with his wife on January 18, 2007; (4) the trial court erred in admitting evidence of the Defendant's use of pornography; (5) the trial court erred in allowing a detective to offer opinion testimony about the Defendant's truthfulness; (6) the trial court erred in instructing the jury on the mental state of recklessness for the counts involving rape of a child; and (7) the trial court erred in sentencing by using an inapplicable enhancement factor and in imposing consecutive sentences.  We affirm the judgments of the trial court in Counts V, VI, VII, IX, and X.  Due to deficiencies in the election of offenses relative to Counts I, II, III, and IV, we reverse those convictions and remand the case for a new trial for those counts.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part; Case Remanded**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH, J., and DONALD P. HARRIS, SR.J., joined.

Peter J. Strianse, Nashville, Tennessee, for the appellant, Fred Chad Clark, II.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

At the trial, K.C., the Defendant's younger daughter, testified that she was six years old and in the first grade. The record reflects that during the time period alleged in the indictment, she was four years old. She said that the Defendant "[t]ouched a private part." She said that she reported this to her mother and that she told her mother the truth. Using a drawing of a female child, she circled the genital area as the place her father touched her. She agreed that both the front and back of the area she circled were private parts. She said the Defendant touched her skin and thought they were in the bathroom when he touched her. She said that it took place at her house and that her sister, H.C., was present. She said she "sort of forgot a bunch of it" because it happened a long time ago. She did not remember if she asked her father not to touch her.

On cross-examination, K.C. testified that she did not remember talking to a woman named Charlsi at the Child Advocacy Center, nor did she remember talking to Latoya. She did not remember telling the women that "nothing happened" with the Defendant. The victim said she loved the Defendant and used to enjoy spending time with him. She agreed they had gone to the beach, Disney World, the dog park, and movies together. She agreed she wrestled with the Defendant but did not recall telling Charlsi that she liked to do so. She agreed it was a "happy time" when her mother and father lived together.

K.C. acknowledged that she had been to the prosecutor's office and spoke with Ms. Reddick about what she would say in court. She said she was not asked the same things repeatedly about the Defendant. She agreed she grew tired of answering questions about the Defendant. She agreed that she was told she did a good job and sometimes was hugged when she spoke about her father during the meetings with the prosecutor. She agreed this made her feel good.

H.C., the Defendant's older daughter, testified that she was eight years old and in the third grade. The record reflects that during the time period alleged in the indictment, she was five and six years old. She said the Defendant touched her "in [her] private area." She did not know if it occurred at their home. When asked to identify on a drawing of a female child where the Defendant touched, she circled the genital area. She said she did not tell her

mother at first and thought the Defendant reported it to her mother. She said she told her mother and other people the truth when they discussed it.

On cross-examination, H.C. did not recall meeting with Charlsi at the Child Advocacy Center until she was asked about sitting on the floor drawing with markers. She thought she was asked about the Defendant. She recalled telling Charlsi that nothing happened with the Defendant and thought that Charlsi questioned her again a few weeks later. She agreed that she loved and missed the Defendant. She said that her sister, her mother, the Defendant, and she were happy when they lived together. She agreed that she had fun with the Defendant at the dog park, the beach, and the movies. She said they took trips to Disney World. She thought she met with the prosecutor four times. She said she was questioned and sometimes wished the questioning would stop because she tired of answering. She agreed that she was told she did a good job and hugged and that this made her feel good.

On redirect examination, H.C. recalled saying at the Child Advocacy Center that it was hard to talk about. She said that she was sad when the Defendant moved out after she told her mother and that she did not want him to move.

Melanie Clark testified that she was the victims' mother and the Defendant's ex-wife. She said that H.C.'s birth date was December 3, 2000, and K.C.'s birth date was December 9, 2002. She said that the four of them lived together until January 2007. She said that she and the Defendant had been together since 1988 and that they had been married for nine years in January 2007. She said that there had been stress in the marriage when making the transition from being a couple to having children and that they discussed separating for a time after K.C.'s birth. She said they worked together to improve the marriage at that point. She said the twelve months before January 2007 were some of their happiest together. She said that they were planning to move to another home together and that they had both become successful professionally.

Ms. Clark testified that on the weekend before Martin Luther King, Jr. Day of 2007, the Defendant, the Defendant's mother, H.C., K.C., and she were at home together. She said that H.C. was sitting in the Defendant's lap at the computer, that she heard a "commotion," and that H.C. came to where she was sitting. She said that when she asked H.C. what happened, H.C. said she had put the Defendant's finger on H.C.'s "coo-coo," the term the family used for a vagina. She said that she asked why H.C. had done it and that H.C. replied that she did not know and that she was trying to be funny. She told H.C. it was not a joking matter, and H.C. went upstairs to her bedroom. She thought it was odd and said she waited a minute before going upstairs to talk to H.C. She sat on the floor with H.C. and told H.C. that no one should touch H.C.'s private parts. She said H.C. refused to talk to her and "was almost like she was physically trying to . . . move away." She said that she and H.C. were

very close and that it was odd for H.C. not to talk to her. She said that H.C. was a happy, talkative child. She said that H.C. seemed uncomfortable and concerned and that this make her feel uneasy. She said it was obvious something was wrong. She said she decided not to pursue the matter with H.C. because H.C. was not ready to talk.

Ms. Clark testified that although she was concerned, she did not question the Defendant. She did not want to offend him and was unsure what was happening because H.C. did not tell her anything. When she came downstairs from talking to H.C., the Defendant said she needed to talk to H.C., but she told him she had already taken care of it.

Ms. Clark testified that a day or two later, she talked to K.C. during bath time. She said she told K.C. never to allow someone to touch her private parts. As K.C. was getting out of the bathtub, Ms. Clark asked if anyone ever touched K.C. She said K.C. responded in a strange, "game-like" voice that "Daddy" touched her. She said she was "floored." She asked K.C. what she meant, and K.C. pointed downward toward her vagina. She said K.C. stated, "Sometimes he goes like this . . . [a]nd sometimes he goes crazy." She said K.C. did not identify the room where the touching occurred but said it took place while Ms. Clark was sleeping. She said that she was frightened for the children's and her safety and that she dressed them and left the house with them as quickly as possible, telling the Defendant they were going to the store. She said she did not consider talking to the Defendant about the matter because she was "afraid of what he would do," even though there was no history of domestic violence between them.

Ms. Clark testified that after she was unable to reach her mother, she called Molly Bernard, a elementary school counselor from her workplace, for advice. She said her concern for the children was a significant factor in her thinking. She said they went to Walmart to shop while waiting for a party to end at Ms. Bernard's house. When they went to Ms. Bernard's house, Ms. Bernard's boyfriend attended the victims and some other children while Ms. Clark talked to Ms. Bernard. The women decided to talk to the victims, beginning with K.C. She said they changed the clothes on a doll and told K.C. that no one should touch her private parts. She said that they asked K.C. if anyone had ever touched her private parts and that K.C. said the Defendant had. She said that when K.C. was asked why she did not tell her mother, K.C. said, "because daddy said it's a secret, not to tell mommy." She said there was no further discussion with K.C. She said they sent K.C. to another room and talked to H.C., who did not want to discuss it and wanted "to remove herself from the situation." She said the questions asked of both girls were open-ended, as in whether someone had touched the girls' private parts, rather than "Did daddy touch you?"

Ms. Clark testified that she did not feel comfortable returning home after K.C.'s report that the Defendant touched her while Ms. Clark was sleeping. She said that she contacted

her parents to request assistance and that she contacted the Defendant to let him know they would not be home that night. She told him she was stressed about her change of employment and their plans to sell their home. She said she was afraid of what the Defendant might do if he found out what the victims told her. Her parents, the victims, and she stayed in a hotel overnight.

Ms. Clark testified that she and her parents discussed the need to contact the Department of Children's Services (DCS). She said that through her employment as an elementary school librarian, she was trained in the reporting requirements for child sexual abuse. She said that she knew she had to follow the law by contacting the police or DCS and that she called the DCS hotline in the middle of the night. She said a DCS employee contacted her the next day, which was Martin Luther King, Jr. Day. She said that due to her fear, she changed hotels twice. She took cash from her bank account with the Defendant to pay for the hotels and to prevent the Defendant from knowing her whereabouts.

Ms. Clark testified that during the time she was away from home with the victims, the Defendant called her cell phone but that she did not reveal the victims' allegations. She said the Defendant threatened to call the police and report that she had taken their children. She said that she told him to "go ahead" but that she was not concerned whether he did so because she had reported the circumstances to the authorities.

Ms. Clark testified that she contacted the police rather than wait the full five-day period to hear from DCS. On Wednesday, Detective David Zoccola from the sex crimes unit contacted her about the possibility of talking to him and "the possibility of a wire." She said she wanted to know what to do, to have protection, and to talk to the Defendant "but . . . didn't dare do it on [her] own" without police assistance. Detective Zoccola told her that she could call the Defendant from the justice center, that the call would be recorded, and that he would assist her if she needed help talking to the Defendant. She said she wanted to do it to find out what happened to her daughters and to help them recover.

Ms. Clark testified that she made the controlled telephone call, which took place on January 18, 2007, and lasted about forty-five minutes. She acknowledged that she was not truthful with the Defendant in the call. She said she told him that she needed to know what happened with the victims and that they could be together as a family if he told her the truth. She said, however, "It wasn't an option." She said that initially, the Defendant denied touching the children and claimed not to know what she was talking about. He offered to take a polygraph examination. She said the Defendant had deceived her in the past about his continued use of pornography after she told him it offended her. She agreed that the Defendant had used adult, not child, pornography. She said the Defendant had reassured her that he was no longer viewing pornography on the computer but that she would discover

otherwise on an ongoing basis. She said his denial of touching the victims was consistent with the existing distrust between them relative to his use of pornography. She said that the Defendant claimed repeatedly that he would not admit something he did not do but that she thought this was part of his deception. She said she did not believe him after the things K.C. told her. She said that as the conversation progressed, the Defendant starting saying that he might have touched the victims but did not remember. She said he offered to admit it in order for her to come home but that she said, "Absolutely not . . . I want the truth." She said that after the Defendant became equivocal in his denials, he admitted to her that he had been sexually abused by a teenager when he was young. She said she had never heard this previously. She acknowledged that the Defendant asked if anyone was listening to the conversation and that she told him no. She said the Defendant remained concerned that someone was listening and wanted a face-to-face meeting. She said that she offered to meet him the following day but that he was adamant they meet that day. She said the Defendant finally admitted that he touched the children but still wanted to meet to discuss it.

Ms. Clark testified that the telephone call began on a police line but that static was on the line. She said that the Defendant asked if she was with the police and that she denied it. She said that the Defendant told her to be right by her cell phone, that he called her back on her cell phone, and that the police were not able to connect a recording device to her cell phone between the calls. She said the cell phone call lasted about ten minutes and concerned the details of their face-to-face meeting.

Ms. Clark testified that she and Detective Zoccola discussed placing a "wire" on her body but that they decided to place a listening device in her car because it would be safer. She said there were about four officers involved in placing the recording equipment in her car and that they told her that for her own safety, she must not get in the Defendant's car. She said she was fearful for her safety and that of her children, even when she went to the police station. She said she agreed to meet with the Defendant because she knew he would not tell her the truth otherwise. She said she did not believe he had been fully forthcoming with her.

Ms. Clark testified that she went to the Opry Mills parking lot, where she had agreed to meet the Defendant. She said the Defendant entered her car. She said that the officers talked to her beforehand about what she should discuss with the Defendant but that other than her cell phone, she had no means of communicating with them once the Defendant was inside her car. She said that she was truthful when she told the Defendant she loved him but that it was an "odd situation." She said the Defendant immediately described the details of his touching H.C. and K.C. She said he admitted touching the victims' bottoms in the bathtub at their home. She said he admitted penetrating K.C.'s vagina with his finger. She said she told the Defendant she would not come home if she could not trust him and that he

-6-

must tell her the truth. She said that they were in the car together about forty-five minutes and that the Defendant admitted touching the victims between five and seven times and that he admitted touching K.C. two to four times. She said that the "touching" was described to her as penetration with his finger. She said the Defendant initially admitted only that the had touched the girls the previous weekend but that he eventually said he "had these thoughts for the past six months." She said the Defendant told her the victims had asked him to stop. She said that after the conversation ended, the Defendant was arrested. She said she used the Defendant's cell phone to call his affluent friends and asked them not to post the Defendant's bond. She said she was concerned for the victims' and her safety.

Ms. Clark testified that she returned to their home and viewed the family's computer. She said she found evidence that the Defendant had visited pornographic websites. She said that she took the victims to Our Kids Center, a rape and sexual abuse center, and two counselors, and that she complied with the requests of DCS and the investigators. She said she talked to the victims and tried to reassure them. She said the victims made additional disclosures to her about other instances of the Defendant digitally penetrating them. She said that H.C. had shown signs of post-traumatic stress disorder.

On cross-examination, Ms. Clark testified that the incident when H.C. put the Defendant's finger on her genital area was on Friday or Saturday of Martin Luther King, Jr. weekend in 2007. She said she left the house with the victims on Sunday. She denied that after the incident on Friday or Saturday, the Defendant told her to take H.C. upstairs and explain that it was inappropriate, although she acknowledged that Detective Zoccola's report from his interview of her stated this. She said the Defendant did not ask her to talk to H.C. until after she had already done so. She said that she did not remember exactly what she and the detective discussed but that it might have been a "translation issue."

Ms. Clark acknowledged that H.C. did not report anything at Ms. Bernard's house but denied that they questioned K.C. because H.C. would not talk. She stated that she did not talk to the Defendant about the allegations until Thursday, January 18 because she was afraid for the victims' and her safety even though they had been together for about eighteen years and married for nine years. She said there was no history of domestic violence between them.

Ms. Clark testified that although Detective Zoccola told her any recordings of her talking to the Defendant could be used as evidence, he did not say that she had to participate. She said they did not talk about prosecution of the case and focused instead on her need to determine what happened. She agreed that the detective instructed her about how she should conduct herself during the call. She did not recall Detective Zoccola telling her not to make any promises to the Defendant, although she said he told her to try to refrain from making

statements such as that she wanted to stay married to the Defendant. She said he told her that she needed to demand the truth.

Ms. Clark testified that she asked the Defendant if he had been molested by a cousin, who had been identified to her previously by the Defendant's family. She said the Defendant told her the perpetrator was a different cousin. She said that Detective Zoccola was in the room during her second telephone call with the Defendant and could hear her side of the conversation. She did not recall Detective Zoccola telling her to ask the Defendant whether touching the victims had been sexually gratifying.

Molly Bernard testified that she was an elementary school counselor and Ms. Clark's coworker. She said she had not been acquainted with Ms. Clark outside the workplace but knew the victims because they were students at the school where she worked. She said that Ms. Clark called during Ms. Bernard's daughter's birthday party but that she allowed Ms. Clark to come to her home because Ms. Clark seemed to be in an emergency situation. She said that Ms. Clark arrived within the hour and that they spoke privately before talking to the victims. She said Ms. Clark informed her of the allegations and asked if she would speak privately to the victims.

Ms. Bernard testified that she and Ms. Clark took K.C. into Ms. Bernard's bedroom and, following the same procedure Ms. Bernard used with students, discussed private parts. She said K.C. was able to identify her private parts. She asked if anyone had touched K.C.'s private parts and K.C. said the Defendant had. She said K.C. placed her hand "down just toward her private part," moved it back and forth, and said, "he does this to me, and sometimes my daddy goes crazy when he touches me like that." She said that K.C. did not actually touch herself but put her hand between her legs. She asked whether the Defendant touched K.C. under her panties and K.C. said yes. She asked why K.C. did not tell anyone and K.C. said that the Defendant told her not to tell. She said that after K.C. left the room, Ms. Clark was upset and said that her life had changed. Ms. Bernard said it seemed important to Ms. Clark that she maintain her composure in front of the victims. She said that they tried to talk to H.C. but that H.C. did not want to talk. She said H.C. was running around and playing. She said that she had become closer to Ms. Clark and the victims since January 2007. Ms. Bernard said that within a couple of months, H.C. told her that the Defendant touched her private part one time. She said H.C. asked if Ms. Bernard knew why the Defendant did it.

On cross-examination, Ms. Bernard testified that H.C. was not having fun but was "distraught and in her own world" when she and Ms. Clark tried to talk to H.C. She said that at the time, she did not know H.C. well and that they did not want to push H.C. to talk to

-8-

them. She agreed that K.C. reported that sometimes the Defendant "went crazy," indicating rough touching. She said that she and Ms. Clark called DCS the next morning.

Kenneth Jordan testified that he was H.C.'s Sunday School teacher in the fall of 2007. He said that H.C. told him, "My father has sinned." He said that H.C. told him that the Defendant touched her "down there" and pointed to her lap. He said he asked H.C. whether her mother knew and that H.C. said, "Yes, I live with her now." He said he reported the incident to the children's minister.

On cross-examination, Mr. Jordan testified that the incident took place on September 23, 2007. He said that about one week later, he prepared a written memorandum about the incident at the request of the children's minister. He said that his wife was in the room when H.C. made the statement and that another student may have been present. He said he was told by a clergy member that there were ongoing legal proceedings.

Sue Ross, a nurse practitioner with Our Kids Center and an expert in pediatric forensic sciences and examination, testified that there was a danger that physical findings from examination of children who are alleged victims of sexual abuse may be "over-interpreted." She said that the absence of a hymen or the presence of anal fissures did not establish definitively that sexual abuse occurred. She said that one of the purposes of Our Kids Center, a child sexual abuse specialty clinic, was to ensure that findings were not over-interpreted and that the center was conservative in this regard. When asked hypothetically if a report of a burning sensation when urinating was related to a report of a child's genitals having been rubbed, she said that they might be related but that there could be other causes of the burning sensation.

Ms. Ross testified that she performed physical examinations of H.C. and K.C. She said that a social worker, Phyllis Thompson, would have talked to the victims' mother and H.C. beforehand to obtain the relevant history. She said that K.C. was not interviewed because the center's policy was not to interview children who were less than five years old. She said that young children were confused by multiple persons asking questions and that young children sometimes attempted to please people who questioned them by answering questions incorrectly.

Ms. Ross testified that she would not have necessarily expected to find injury from touching on the outside of the genital structure. She said that rubbing the outside of the genitals typically did not cause injury and that any injury typically was mild. She said that most children could not differentiate between their vaginal and genital areas. She said that children tended to characterize any touching of a mucosal surface as being "inside." With regard to digital-anal penetration, Ms. Ross testified that injury was unlikely. She said that

both H.C. and K.C. had normal findings on examination of their anal and genital areas. She said it was unlikely that she would have seen any injury from digital penetration weeks earlier.

On cross-examination, Ms. Ross testified that young children sometimes gave "bizarre responses" to questioning about alleged sexual abuse. On redirect examination, Ms. Ross testified that other experts did not have the same policy as Our Kids Center about not interviewing children under five years old. She acknowledged that it was possible that a child might withdraw a disclosure or "clam up" if interviewed multiple times.

Metro Police Detective Chad Gish testified that he was assigned to the Surveillance and Technical Support Unit. He set up the transmitter and the recorders in Ms. Clark's car and monitored the meeting between Ms. Clark and the Defendant in the Opry Mills parking lot. He thought Detective Zoccola was also present. He said the equipment recorded the entire conversation between the Clarks.

Detective Gish testified that he also conducted a forensic examination of computer equipment for child pornography. He said he did not find any child pornography images but found thousands of images of adult pornography. He found no evidence that the computer had been used to access child pornography websites but found evidence that the computer had been used to access adult pornography websites. He compiled a report that listed a representative sample of the websites. The report listed the most recent visits as occurring on January 15, 2007, but he said other visits might have occurred after that date that were not included in the representative sample he listed. He said two sites were visited a total of fourteen times on January 15.

On cross-examination, Detective Gish testified that he installed the equipment in Ms. Clark's car on January 18, 2007. He did not recall whether the recording contained any last minute instructions from one of the officers to Ms. Clark. He did not recall hearing any music on the recording but said he instructed people who were assisting the authorities to turn off radios and air conditioners in order to minimize background noise.

Metro Police Detective David Zoccola testified that he was assigned to investigate the allegations of sexual abuse of H.C. and K.C. in January 2007. He said that the police department received a referral from DCS on January 15 and that he spoke by telephone with Ms. Clark on January 16 or 17. He said he explained the investigative process and options to her, including the possibility of making a controlled telephone call from a location where the conversation could be recorded. He said Ms. Clark was willing to make a controlled call to the Defendant. He said that had Ms. Clark not been willing to make the call, the alternative would have been for him to investigate the case and then interview the Defendant.

He said that Ms. Clark was able to ask intelligent questions and that he wrote additional questions for her to ask during the call. He said the equipment used for the call allowed for disguising the telephone number from which the call was made. He said the number was disguised to appear as Ms. Clark's cell phone number.

A recording of the call was played. In the call, Ms. Clark questioned the Defendant about the victims' allegations. The Defendant repeatedly denied sexually abusing the victims. Ms. Clark said that in retrospect, she saw signs that the Defendant had been abusing the victims, such as the victims having vaginal redness and pain. Ms. Clark told the Defendant that she viewed their computer's browsing history and knew that he had viewed pornography after promising her that he would not. The Defendant acknowledged that he did so. He also admitted that he masturbated while viewing adult pornography on the internet. Ms. Clark asked the Defendant if a family member molested him. He denied that he was molested by the person she named. The Defendant asked that they attend family counseling and that Ms. Clark meet him face-to-face to discuss the matter. Ms. Clark said that she thought the Defendant molested the victims and that the allegations would come to light if she took the victims to be examined by a doctor. She said the Defendant's friends and family would find out about the allegations. She told the Defendant to tell her the truth, reassured him that she loved him, and said she wanted the two of them to attend counseling. The Defendant said he was going to "make something up" in order to satisfy Ms. Clark. He said that he put his finger in K.C.'s anus but that it was a lie. Ms. Clark said she did not want him to lie. He admitted that when he was a child, he was sexually abused by a teenager. He said he did not remember touching the girls and denied thinking about the victims. When asked if it was possible that he touched the victims, he said, "Anything is possible." Ms. Clark said that she wanted to bring the victims home that night and for the four of them to live together as a family. Ms. Clark denied that anyone was listening to the conversation. She said they would lose everything if the Defendant did not tell her the truth. The Defendant admitted that in the last several months, he thought of the incident in which he was molested. He said that if he did something to the victims, he did not remember it. Ms. Clark denied that she would call the police if the Defendant admitted anything. The Defendant admitted he touched the victims, expressed concern that someone was listening to the call, and said he would give her more information if she would meet him face-to-face. The Defendant said he would call Ms. Clark later.

After the recording was played, Detective Zoccola testified that they attempted unsuccessfully to place a recording device on Ms. Clark's cell phone before the Defendant called. He said they heard what Ms. Clark said during the second call but did not hear the Defendant. He said that there was further discussion of the victims' allegations and that arrangements were made for the Defendant and Ms. Clark to meet. He said the Defendant, not Ms. Clark, wanted the meeting. He said that before the meeting, he talked to Ms. Clark

about how to conduct herself during the meeting and established a code word for her to use if necessary to ensure her safety. He said that they gave Ms. Clark some guidelines about what she could say to the Defendant and that Ms. Clark tried to give the Defendant the sense that their family could be reunited and no report of the abuse made if he were honest.

Detective Zoccola testified that after Ms. Clark's car was equipped with recording and listening devices, she went to the Opry Mills parking lot. He said that he and some "tech guys" went in an unmarked van and that there were at least two other unmarked cars. The recording was played for the jury. In the recording, the Defendant said that he was ashamed of what he had done and that he sometimes had "dark or troubled thoughts" about sex. He said he never had any sexual thoughts about the victims until the previous week when the victims were in the bathtub. He said that H.C. spread her legs and that he looked at her vagina. He said he touched the victims but did not insert his finger into their vaginas. He admitted he put his finger inside K.C.'s anus but said it did not arouse him. He insisted the sexual abuse only occurred on one occasion and said he realized he did something wrong and left the room. He said he thought his late night use of pornography prompted his actions. Ms. Clark told the Defendant she did not believe he told her everything. She said that they would not be together if he did not tell her the truth. The Defendant insisted he never had the victims touch him. He said he did not penetrate the victims' vaginas but admitted he inserted his finger into their anuses. He denied rubbing the victims' clitorises. He said that for the last few months, he thought about the molestation in his past but never had any impulses until the incident the previous week. After Ms. Clark insisted that the Defendant must be honest with her, he admitted having thoughts for a while and touching the victims a total of five to seven times. He said he was ashamed and did not know why he did it. He said he "never put any of [his] organs in their organs." He said he touched H.C.'s vagina and "barely" put his finger inside her when H.C. was in bed. He said he was "just throwing a number out" and did not know how many times it occurred. He said he never penetrated K.C.'s vagina, only her anus. He said he touched K.C. two to four times in the past two months. He said the abuse had been going on since summer. He denied ever threatening the victims and admitted the victims asked him to stop. He denied that anyone else was involved or that he viewed child pornography on their computer. The Defendant expressed his desire to remain with Ms. Clark and work on their relationship. Ms. Clark said that she was not prepared to return home that night, that they would reunite at the family home the next day, and that she would attend counseling with the Defendant. Ms. Clark said she would eventually forgive the Defendant and they would move on. The Defendant denied that smoking marijuana made him abuse the victims. Ms. Clark answered a telephone call and said something about the children. Shortly thereafter, she said she had to leave to get the victims.

After the recording was played, Detective Zoccola testified that the call Ms. Clark received during the meeting was from him and that she pretended to be speaking to someone about the children. He said that he and his supervisor thought they had enough information and were concerned that the Defendant might become depressed or endanger Ms. Clark if the conversation continued. He said the Defendant was taken into custody at the scene.

Detective Zoccola testified that he believed Ms. Clark and what the Defendant said on the tape. He said the Defendant was not interviewed after he was taken to the Criminal Justice Center. He said the Defendant waived his <u>Miranda</u> rights and talked to Sergeant Elliott and him for almost two hours. He acknowledged that he told the Defendant that it would be to the Defendant's advantage to admit what he did.

Detective Zoccola testified on cross-examination that he prepared supplemental reports in connection with the investigation. One of these supplements summarized his interview of Ms. Clark on January 17, 2007. He recalled Ms. Clark telling him that when the incident in which H.C. put the Defendant's finger on her "coo coo" occurred on January 12, the Defendant was surprised and told Ms. Clark to take H.C. upstairs and question her. He agreed that in a situation such as Ms. Clark talking to the Defendant while assisting the police, they tried to avoid having the person make promises to the person being investigated. He said, however, he had little control over what was said. He acknowledged his prior testimony that he told Ms. Clark she did not have the authority to promise the Defendant anything.

The recording of Ms. Clark's part of the second telephone call between her and the Defendant was played. The call was over thirty minutes long. In it, Ms. Clark said that she wanted to know the truth and that the Defendant must "give [her] something." She promised not to get anyone else involved. She said she asked the victims questions on Saturday. She said that she would meet him later that day but that if she did so, she wanted more information about his sexual abuse of the victims. She told him that if he touched the victims, he would not be able to block it out. She told him to tell her how he touched them. She reminded him that he admitted earlier that he touched them. She said he was lying. She said she wanted to get back together with him but she must have the details. She told him that she knew he had been abused and that he was not a monster. She asked about the time period of the abuse and whether it occurred before K.C. was born. She said, "You have touched them inappropriately?" and "In what way?" She asked if the Defendant put his finger in K.C.'s anus and H.C.'s vagina and anus. She said she was not "setting [him] up" and reminded him that he called her on her cell phone. She said she did not want people in her workplace to know what he did. She asked again whether he put his finger in H.C.'s anus, followed by asking if he did it for sexual gratification and about the time period involved. She asked him why he did it if it was not arousing. She said "maybe" was not an

acceptable answer to whether he did it for sexual gratification. She asked whether the girls touched him. She said that if she took K.C. to the doctor, the doctor would know if he penetrated K.C. with his finger.

Ms. Clark stated that although the Defendant admitted earlier that he touched the victims, he was denying it now. She said that H.C. told her that he rubbed H.C.'s vagina with his finger and inquired whether it was true. She said that the Defendant was "jerking [her] around" and that he must tell her now about the abuse or she would not meet with him. She said, "You stuck your finger in her butt?" and "Far enough?" She asked if he told the victims it was a secret and asked why K.C. would say this if it were not true. She said she deserved to know what he did to the victims in order to be able to talk to them. She said she did not want a counselor involved. She said, "You touched it just to see what it felt like." She said she knew the truth but wanted to hear him say it. She said that both victims told her that he put his finger on the victims' vaginas and that they showed her what he did. Ms. Clark asked where it occurred and said that K.C. told her the Defendant touched her when Ms. Clark was asleep. She asked if he was telling the truth or was telling her what he thought she wanted to say. She said that she thought he was finally telling her the truth and that she knew she could trust him. She told him she loved him, was not mad at him, and was not going to leave him. She asked if they could meet outside Opry Mills.

Detective Zoccola testified that he was able to write down more topics for Ms. Clark to discuss with the Defendant during the first call than the second. He denied that he prompted her during the second call to ask about sexual gratification but acknowledged that he discussed the elements of the crime with her before the first call and that he probably discussed the sexual gratification element with her. He did not recall what he told Ms. Clark about promising not to divorce the Defendant if he admitted something. He said Ms. Clark had to promise the Defendant something in order for him to talk, that he told her to say they could get on with their lives if the Defendant would admit what he did, and that he probably told her to avoid using the word "police" when saying she would not report any admissions.

On redirect examination, Detective Zoccola testified that he would not have told Ms. Clark to say that she was divorcing the Defendant, that she hated what he did, or that he would never see the victims again. He said these statements would not have kept the conversation going.

At the end of the State's proof, it elected for Count One the rape incident in which the Defendant admitted in his recorded statement that he put his finger in H.C.'s vagina in the summer of 2006 for the first of five to seven times. For Counts Two, Three, and Four, the State elected the second, third, and fourth rape incidents in which the Defendant admitted in his recorded statement that he put his finger in H.C.'s vagina five to seven times between

-14-

June 1, 2006, and January 12, 2007. For Count Five, the State elected the rape incident the Defendant admitted in his statement in which he barely put his finger in H.C.'s vagina when she was in bed. For Count Six, the State elected the aggravated sexual battery incident the Defendant admitted in which he touched H.C.'s vagina when she was in the bathtub during the week before Martin Luther King, Jr. Weekend of 2007. For Count Seven and Eight, the State elected the first and second, respectively, of two to four rape incidents the Defendant admitted in which he put his finger in K.C.'s anus two months to six weeks before Martin Luther King, Jr. weekend of 2007. For Count Nine, the State elected the rape incident in which the Defendant admitted putting his finger in K.C.'s anus as she lay on her side in the bathtub the week before Martin Luther King, Jr. weekend of 2007. For Count Ten, the State elected the aggravated sexual battery incident in which the Defendant admitted in his recorded statement that he touched K.C.'s genital area on the bone when she was in the bathtub the week before Martin Luther King, Jr. weekend of 2007. The State rested.

The Defendant testified that he was thirty-seven years old and had a bachelor's degree. He said that he was working for a security company until his employment was terminated due to the charges in this case and that he was presently working as a salesperson for a workplace uniform company. He said that his divorce became final in May 2009 after Ms. Clark filed her divorce petition on January 26, 2007, and that the divorce was due to the allegations in this case. He said that he and the victim's mother had been a couple since they were in high school and that his only serious relationship was with her.

The Defendant testified that he did not see the victims between January 14, 2007, and the Fall of 2009. He said he had an excellent relationship with the victims. He said his life changed when H.C. was born. He said they took vacations, went on day trips, talked about school, played sports, and played with their dog together. He said he was an involved father, sharing duties with Ms. Clark for transporting the children to and from school, preparing meals, and caring for the children when they were sick and unable to attend school. He said he was home for dinner every evening unless he was traveling for work. He said that although he bathed the victims on occasion, it was primarily Ms. Clark's responsibility. He said he was more of a "lifeguard" who supervised the girls for their own safety when they were in the bathtub. He said Ms. Clark read to the victims almost every night. He said that he and Ms. Clark told the victims never to keep secrets and that the victims were not good at keeping secrets.

The Defendant testified that before January 14, 2007, their home life was great. He said that they were in the process of selling their home and moving to a new home, that the victims were enrolled in a private school, and that they took a trip to Disney World the previous month. He said that their home was a gathering place on holidays and that their

extended family members were in their home frequently. He said there was no anger or tension in the home.

The Defendant testified that on January 12, 2007, his mother babysat the victims while he and Ms. Clark were away. He said that they came home around 9:45 or 10:00 p.m. and that he and his mother viewed computer photographs and video from their Disney World vacation. He said that they were focused on the computer and that H.C. sat in his mother's lap and tried to get their attention by turning off the computer. He said H.C. was playful and happy. He said H.C. pulled his arm from his chair's armrest and said, "Daddy, I'm going to try to put your finger on my coo-coo." He said she was laughing. He said that he had not been paying attention but that when he heard H.C. make the statement, he asked her what she was talking about. He said that H.C. stood behind him and looked at Ms. Clark and that H.C. may have repeated her statement to Ms. Clark. He said that he thought Ms. Clark asked H.C. why she made the statement and that H.C. said she was trying to be funny. He said he told Ms. Clark to take H.C. upstairs and explain that the statement was inappropriate. He said his mother heard H.C.'s statement.

The Defendant testified that after three to five minutes, H.C. and Ms. Clark returned. He said Ms. Clark told him that H.C. had something to tell him and that H.C. informed him that she had a loose tooth. He said that the victims went upstairs to go to bed about 10:15 or 10:30 p.m. and that he and his mother went upstairs to see them. He said that Ms. Clark was reading to H.C. and that K.C. was on the floor playing. He said that later he asked Ms. Clark whether she spoke with H.C. about what happened earlier and that Ms. Clark told him she had addressed it. He said Ms. Clark did not seem upset or confront him about H.C.'s statement. He described the family's activities the following day and said that Ms. Clark never said anything about the incident the previous night. He said he played golf the next day, January 14, and talked to Ms. Clark by telephone about their dinner plans. He said that when he arrived at home that evening, Ms. Clark seemed distant and he could tell something was wrong. He asked her after dinner why she was mad, but she said it was no big deal. He said she seemed more like herself. He said Ms. Clark told him that she and the victims were going to meet Ms. Clark's mother at WalMart. He said he offered to accompany them, but she told him not to come. He said Ms. Clark called him around 8:30 p.m. and said she was taking the victims to a co-worker's house to play. When they did not return home after 10:00 p.m., the Defendant called Ms. Clark, who informed him they were not returning home. He said this was the first time Ms. Clark ever did this. He said that Ms. Clark claimed to be stressed because of her new job, their upcoming move, and the construction of their new house and that she wanted to spend the night with her mother. He said that he asked her to come home to discuss her concerns and that she did not confront him about inappropriate behavior with the victims.

The Defendant testified that he was upset the next morning, which was Martin Luther King, Jr. Day. He called Ms. Clark at 8:00 a.m. and continued calling fifteen to twenty times until he reached her around 10:30 a.m. He said it was unusual for Ms. Clark to decline his calls or fail to return them if he left messages. He said Ms. Clark repeated that she was stressed but did not mention anything about inappropriate behavior. He said he told Ms. Clark that he was concerned about her and that he would call the police to file a missing persons report because she had the children with her. Ms. Clark requested more time to think, and the Defendant did not call the police. He said he called Ms. Clark's father, who told him Ms. Clark was stressed and was "going to blow her top." He said he was not able to reach Ms. Clark by telephone the rest of the day but thought he talked to her father that afternoon.

The Defendant testified that he attempted to call Ms. Clark's mother and sister early the next morning but did not reach them. He said that his mother came to his house and that he wanted to go to see his father-in-law, but that his father-in-law told him not to come. He said he spoke with his father-in-law later, who told him he might need to prepare for a divorce. He said that when he still was unable to reach Ms. Clark the following day, Wednesday, he went to his father-in-law's house but no one answered the door. He said he and his mother were on their way to find Ms. Clark and the victims that evening, when Ms. Clark called him. He said that after Ms. Clark told him they could meet on Thursday, he decided to abandon the search. He said Ms. Clark asked him to stay away from their house in order for her to retrieve the victim's belongings. He said that he went to a neighbor's home but that Ms. Clark never appeared.

The Defendant testified that he was frantic while Ms. Clark and the victims were gone. He said he was worried that Ms. Clark was having a mental health crisis and that the victims might be in danger. He said he talked to his mother, who mentioned the incident in which H.C. tried to put his hand on her genitals as a possible reason for Ms. Clark's departure, but he thought at the time that the incident had been addressed.

The Defendant testified that he called in sick to work on Thursday, January 18, 2007. He said he attempted to check his bank account online but found that the password had been changed. He called the bank and learned that a $2000 check was cashed two days earlier. He suspected that Ms. Clark was going to divorce him. He said that he was unable to reach Ms. Clark until she called him and that he called and reached her once after that call. He said his mother was sitting next to him listening to the conversation when he called Ms. Clark on her cell phone. He and Ms. Clark made arrangements to meet at Opry Mills that evening. He said that after the call, he told his mother that Ms. Clark wanted him to say he had done something to the victims and that he was going to do so in order to get her to come home. He said he was shocked and devastated by the accusation of misconduct with the victims.

The Defendant testified that he was never sexually abused by a relative named Dennis. He acknowledged that there was an incident when he was six years old involving a teenage boy who babysat his sister and him. He said that the boy "flashed" him but that he did not touch the boy. He said he embellished the story because Ms. Clark was badgering him and he thought she might come home if he would "give her something."

The Defendant testified that he never raped or touched the victims inappropriately. He said that in retrospect, it made no sense that he told Ms. Clark he sexually abused the victims. He said that he had been through four days of anxiety and uncertainty about his family and that he thought Ms. Clark would come home if he said he abused the victims. He said he had about five or six hours of sleep during the four-day period. He said that he denied the allegations many times but that Ms. Clark would not accept his denials. He said that as a result of saying he sexually abused the victims, he had lost everything and would not fabricate a story if he could do it again. He said that Ms. Clark had a strong personality and that he generally deferred to her. He said Ms. Clark handled the family's finances, made decisions about vacations, and initiated their choice of the house they lived in. He said he did not object to the dynamics of their relationship. He said that he tried to avoid conflict but that they sometimes argued and went their separate ways, with him going to a friend's house or another room. He denied ever assaulting Ms. Clark.

The Defendant testified that his use of pornography was minimal. He said the home computer was six or seven years old and that the laptop computer did not have any pornography in its memory. He said he viewed other websites as well as ones with pornography.

On cross-examination, the Defendant testified that he loved his children and that they had no reason to fabricate the allegations. He said he did not have any idea that Ms. Clark would intentionally hurt the victims. He said did not know if Ms. Clark ever manipulated or lied to him in the past.

The Defendant testified that his account of the events when H.C. tried to put his hand on her genitals differed from Ms. Clark's in that he told Ms. Clark to take H.C. to another room and talk to her, rather than that he ignored H.C., and that Ms. Clark said that H.C. ran from the room. He regretted not going with them to discuss the incident. He said he was frantic after Ms. Clark left with the victims but acknowledged he spoke with Ms. Clark and Ms. Clark's father during their absence. He did not recall nor did he deny that he looked at Internet pornography on the evening of January 15, 2007. He acknowledged that he did not call the police due to safety concerns about the victims and said that it "never entered [his] mind" to see an attorney about his parental rights. Despite his testimony that he was shocked when Ms. Clark accused him of wrongdoing, he acknowledged that in the recorded telephone

calls, he raised the issue by asking whether Ms. Clark thought he had touched the children. He said that before the conversation with Ms. Clark, his mother asked whether he thought the incident with H.C.'s trying to put the Defendant's hand on her genitals might be the reason for Ms. Clark's departure.

The Defendant testified that in the recorded telephone call in which only Ms. Clark can be heard, he denied his previous admission of touching the victims. He said he suspected that someone was listening to the first call because he heard prolonged static. He acknowledged that he yelled, cursed, and made demands in the first call. He said that he thought he was having a private conversation with Ms. Clark when he was in her car at Opry Mills. He said that Ms. Clark rejected the truth, that he began to lie, and that "it kind of snowballed from there." He said that in his interview with Detective Zoccola, he denied everything he told Ms. Clark, except that he had been sexually abused as a child. He said that regarding his pretrial statement, he was scared of being jailed and having bad things happen to him. He acknowledged that he did not tell the police that his statements to Ms. Clark had been embellished. He agreed that he told both Ms. Clark and the police that he had been troubled by an incident a few days earlier in which he caught himself looking at H.C.'s genital area and said that this account was true. He said his mother tried to talk him out of telling Ms. Clark that he did things he did not do. He said he told his mother, "This is all I got [sic] to do to get them to come home." He said his mother stayed with him for an hour or two after his telephone conversations with Ms. Clark.

The Defendant acknowledged that he testified previously that the recording from the meeting at Opry Mills did not contain his initial statement to Ms. Clark that after he had time to think and talk to his mother, he could not admit something that was not true but that he wanted to talk and work things out. He agreed that he listened to the higher quality copy of the recording that the district attorney's office provided to his attorney and that it did not include what he thought was on it. He said Ms. Clark "hammered" him with questions until he admitted something. He agreed, however, that despite his admissions of inappropriate conduct toward the victims, he was consistent in his denials that he made the victims touch him or that he viewed child pornography. He acknowledged that he lied to Ms. Clark repeatedly about his use of adult pornography, which he said Ms. Clark viewed as "cheating on her." He said the use of adult pornography was not "that big of a deal" to him, although it was to Ms. Clark.

The Defendant acknowledged that he looked at H.C.'s vagina when she was in the bathtub and wondered why he looked at it. He did not think he testified previously that he did not look at H.C.'s vagina.

On redirect examination, the Defendant testified that before his arrest in this case, he never had any charges except a speeding ticket. With regard to his frame of mind at the time he gave his pretrial statement, he said he tried to cooperate because he was afraid that someone might kill him in jail if anyone learned of the nature of his charges.

Janet Clark, the Defendant's mother, testified that she babysat the victims on January 12, 2007, while the Defendant and Melanie Clark went out. She said the victims were happy and normal. She said that the Defendant and Melanie returned around 10:00 p.m. and that she viewed a video and photographs from the Defendant's family's recent vacation. She said that both victims sat on the Defendant's lap at times, that K.C. eventually went elsewhere, that H.C. tried to get their attention, and that H.C. went to the floor and attempted to unplug the computer. Mrs. Clark said that H.C. tugged on the Defendant's arm and that H.C. said that "she tried to put her daddy's friend [sic] on her coo-coo." Mrs. Clark claimed that she asked the Defendant what H.C. said and that the Defendant responded that he did not know. She said that the Defendant asked Melanie whether she heard what H.C. said, that Melanie did not respond, and that the Defendant asked again. Mrs. Clark said that Melanie asked H.C. to repeat it and that H.C. complied. She said he told Melanie to take H.C. upstairs and tell her "this is not right." She said that Melanie and H.C. left hand-in-hand and returned five of six minutes later. She said that H.C. approached the Defendant, stated that she had something to tell him, and revealed that she had a loose tooth. The Defendant moved the tooth. She said that Melanie took the victims upstairs for bed, that she and the Defendant continued viewing the vacation video and photographs for a few minutes, and that she went upstairs to say good night to the victims. She said that everything appeared normal when she left.

Mrs. Clark testified that on the morning of January 13, 2007, she babysat the victims for a couple of hours while the Defendant and Melanie were packing for their move. She said that nothing appeared to be unusual about the victims and that the previous night's incident was never mentioned. She said that on the afternoon of January 14, she talked to Melanie by telephone. She said she hoped that Melanie would invite her to visit that night but that Melanie did not do so.

Mrs. Clark testified that on January 16, the Defendant called her at 5:30 a.m. and reported that Melanie and the victims were gone. She said it was unusual for the Defendant to call so early. She said the Defendant told her that he did not know why Melanie left. Mrs. Clark said the Defendant reported that he called Melanie several times but spoke with her just once. She said she went to the Defendant's house after the call and that as she approached, she saw the Defendant sitting in his car and talking on his cell phone. She said she went into the house and waited a few minutes for the Defendant to come inside. She said the Defendant reported that Melanie was not taking his calls, that Melanie's father told the

Defendant that Melanie "had blown a gasket," that she was "acting crazy," and that the Defendant was concerned for the victims' safety and wanted to make a police report. She said, though, that the Defendant did not alert the police because Melanie's father reassured the Defendant that the victims were fine. She said the Defendant stated that he would do anything to get his family to return.

Mrs. Clark testified that she spoke with the Defendant by telephone on January 17, 2007. The Defendant reported that Melanie still would not take his calls and that he wanted to arrange a face-to-face meeting with Melanie. She said the Defendant came to her house that evening, that he was upset because Melanie had not taken his calls, that he wanted to go to Melanie's family members' homes to look for Melanie and the victims, and that she accompanied him. She said that when they were about two miles from her home, the Defendant received a call from Melanie. Mrs. Clark said that during their conversations that day or the previous day, she and the Defendant discussed Melanie's possible reason for leaving and that the Defendant professed he had no idea why she had done so. She did not recall whether they discussed the incident on January 12 involving H.C. but acknowledged they might have discussed it as a possible motivation.

Mrs. Clark testified that on January 18, 2007, she spoke to the Defendant by telephone. She said the Defendant told her that Melanie withdrew about $2000 from a bank account and that Mrs. Clark advised him to go to the bank. She said she went to the bank to meet him but that he never appeared. She said she spoke to him later that day and learned that Melanie accused him of inappropriately touching the victims. She said that she went to the Defendant's home, that he was very upset, and that she was present when he talked to Melanie by telephone. She said that she sat beside him during the call and that she overheard some of Melanie's statements when Melanie talked loudly. She said that Melanie stated, "If you'll just admit to one thing, I'll bring the children home." She said she told the Defendant repeatedly not to admit anything that was untrue and that he told her he would do anything to get his family back. She said the Defendant declined her offer to go to the meeting at Opry Mills.

Mrs. Clark testified that she had known Melanie Clark since the Defendant began dating her at age fifteen or sixteen. She said that Melanie "liked to be in control" but that the Defendant was "happy-go-lucky" and "liked to please people." She said that from his childhood, the Defendant never liked confrontation. She identified Melanie as the dominant person in the marriage and described the Defendant as a loving, involved father.

Mrs. Clark testified that she spent time with the victims weekly or more often. She said that on numerous occasions, she was with the victims away from their parents and that

they never confided that the Defendant touched them inappropriately. She never saw the children act as if they had been "sexualized."

On cross-examination, Mrs. Clark said that Melanie's leaving home with the victims was out of character. She said she was concerned about her grandchildren because Melanie would not take the Defendant's calls. She thought the Defendant's concern that Melanie might harm the children was legitimate. She said that each time the Defendant was about to call the police, Melanie called and said the victims were fine.

Mrs. Clark testified that she asked the Defendant if the incident with H.C. on January 12, 2007, "was taken care of" and that the Defendant said Melanie had assured him that she had done so. Mrs. Clark said she was curious because after the incident, H.C. made a statement about her tooth. She did not recall the date on which she and the Defendant had the discussion. She said she was not concerned after the January 12 incident that the Defendant touched the victims inappropriately because children "say lots of different things." She said she went to the bank to meet the Defendant because she thought Melanie might withdraw all the funds.

Mrs. Clark acknowledged that the Defendant admitted inappropriate conduct. She claimed, however, not to remember the specifics of the Defendant's statements. She said the Defendant made statements agreeing with what Melanie was saying, rather than making independent admissions. She said the Defendant did not agree to everything Melanie said. She said the Defendant "would just tell [Melanie] he touched her on the butt." She said that she told the Defendant not to say he did anything but that his state of mind was to do anything to get his children home.

Mrs. Clark testified that the Defendant was a good father. She said that although children sometimes tested the limits, the victims ultimately did what the Defendant told them to do. She said it was fair to say that the victims wanted to please the Defendant because they loved him. She did not know whether the victims would keep a secret if the Defendant told them to do so.

Eric Rader testified that he worked with the Defendant beginning in 2000 or 2001 and that they lived four doors apart at one point. He said that he saw the Defendant at work on January 16, 2007, and that the Defendant confided that Melanie Clark took the victims and left the Defendant. He said the Defendant cried and showed emotion. He said that the following day, the Defendant said that Ms. Clark wanted to go to the house without the Defendant being there and that he offered for the Defendant to stay at his house, although the Defendant did not do so. He said that initially, the Defendant was confused, but that the

Defendant became frustrated and angry because he was not able to communicate with Ms. Clark.

Mr. Rader testified that in January 2007, he had been the Defendant's neighbor for about six years and had been in the Clark home many times. He said the Defendant had a normal, loving father/daughter relationship with the victims. He said that he ate dinner at the Clarks' home every couple of weeks, that he dined in restaurants with the Defendant and Ms. Clark, and that he took the victims to see movies once or twice. He said the Defendant had been well respected at work. He said that he was shocked when Ms. Clark informed him of the charges against the Defendant and that the charges were inconsistent with his knowledge of the Defendant. He said that almost every time he saw the victims after the Defendant's arrest, they asked about the Defendant and when the Defendant was returning. He said the victims did not seem afraid of the Defendant. He said that the Defendant was trustworthy and that he would believe the Defendant's sworn testimony.

On cross-examination, Mr. Rader testified that he was friends with Ms. Clark as well as the Defendant. He thought that Ms. Clark contacted him about the Defendant's arrest in order to ensure that he would not post bond for the Defendant. He said Ms. Clark was afraid for herself and her children that the Defendant would retaliate. He never heard Ms. Clark disparage the Defendant in front of the victims. He said she said something like "your daddy's away right now being a better daddy."

On redirect examination, Mr. Rader testified that Ms. Clark told him there was medical and psychological evidence to support the allegations and that it was possible there was evidence on her computer. He said that the workplace computers were confiscated.

Dr. James Walker testified as an expert in forensic psychology that he evaluated the Defendant for propensity to be unduly suggestive or overly compliant in interrogation. He also evaluated the Defendant for personality characteristics that might lead him to give a false confession or false implicating statement. In addition to conducting a comprehensive psychological evaluation of the Defendant, he reviewed extensive records that included recordings of the Defendant's conversations with Ms. Clark, the State's discovery materials, and records from the Our Kids Center's evaluations of the victims.

Dr. Walker testified that false confessions were "a very common phenomena in the criminal forensic world." He said that of 245 defendants exonerated through DNA testing by the Innocence Project, sixty-one of them gave false confessions or implicating statements. He said that news reports from the 1930s demonstrate that more than 200 individuals falsely confessed in the Charles Lindbergh kidnapping case. He also said that of 173 people who

falsely confessed to crimes, 80% were convicted, as shown by later exculpatory DNA testing or identification of the correct perpetrator.

Dr. Walker testified that interrogative suggestibility was "the propensity of a person to admit things that they have not done." He said that particular susceptibility had been researched and that the predisposing psychological characteristics included obedience to authority, anxiety and depression, and low intelligence or cognitive problems. He said that a person might falsely confess if the person were trying to escape a stressful situation, were deprived of sleep for several nights, or were subjected to certain interrogation techniques. The interrogation techniques that might prompt a false confession include promise of reward or benefit and casting the subject as the victim in the situation.

Dr. Walker testified that the Defendant scored a 21 on the Gudjonsson Suggestibility Scale, which was one of the highest scores he had ever seen. He said a high score indicated that the person was susceptible to leading questions in an interrogation situation and that the person would be much more likely than the average person to make false admissions. He said that the Defendant's history demonstrated that the Defendant was the submissive partner in the marriage and had a dependent personality. He said that as part of his overall examination, he spoke with the Defendant's pastoral counselor, who described the Defendant as eager to please and conflict-avoidant. Dr. Walker said that the Defendant reported it was important for him to be in a relationship, that he had an intense period of anxiety and depression when Ms. Clark left him, and that he had been deprived of sleep for many nights before the conversation with Ms. Clark. Dr. Walker said the Defendant's personality testing showed that the Defendant acted impulsively, that he liked to project himself as "having it all together" even though he did not, that he had low assertiveness in relationships, that he tolerated stress poorly, and that he had difficulties in situations requiring flexibility. He agreed that the Defendant was "weak-willed."

Dr. Walker testified that in his opinion, the Defendant was frantic to reunite with Ms. Clark. He said that Ms. Clark's promises to return home if the Defendant would admit the truth placed the Defendant in a difficult dilemma.

On cross-examination, Dr. Walker agreed that the primary focus of his investigation was to determine whether the Defendant had personality traits that might lead him to make a false confession. He said he reviewed some of the evidence before he met with the Defendant. He said that he did not form an opinion from the evidence he reviewed regarding the Defendant's level of suggestibility before meeting with the Defendant. He said he met with the Defendant before performing the psychological testing. Dr. Walker agreed that the Defendant had a college degree, that he held responsible positions in his employment, and that he was of average intelligence and normal functioning.

Dr. Walker agreed that the Gudjonsson examination was designed to identify criminal defendants who were most susceptible to making false confessions. He said the test did not have an error rate because it measured a continuum of behavior, not a specific classification. He said that research placed the Gudjonsson test at the 95% confidence interval. He said that the validity of the test would be impacted by the subject's awareness that his suggestibility was being tested. He acknowledged that the Defendant knew the purpose of his evaluation. He said that other tests he administered and his observations of the Defendant corroborated the accuracy of the Defendant's Gudjonsson score. He acknowledged that Wikipedia contained information about the Gudjonsson Susceptibility Scale under the "False Confessions" subject and that an accurate summary of the test was available online.

Dr. Walker acknowledged that no evidence corroborated the Defendant's claim of several sleepless nights before he made the inculpatory statements. He agreed that there was no evidence of food and water deprivation. He likewise agreed that the Defendant began making admissions within about twenty-eight minutes of the first controlled telephone call and that the average interrogation involving a false confession that was studied by Dr. Gudjonsson was sixteen hours. He said that at the time he stated his opinions in a report, he was unaware that the Defendant was questioned for two hours and eight minutes by police officers. He agreed that the police told the Defendant repeatedly that they did not believe him. He acknowledged that the Defendant never admitted during the police interview that he touched the victims inappropriately and that the Defendant retracted his previous admissions.

On redirect examination, Dr. Walker testified that he did not want to change his opinions after he reviewed the recording of the police interrogation. He noted that Ms. Clark was not present when the police questioned the Defendant and that the Defendant had no incentive to make a false statement to them in order to reunite his family.

The jury found the Defendant guilty of five counts of rape of a child regarding H.C., two counts of rape of a child regarding K.C., and one count of aggravated sexual battery regarding each of the two victims. The jury acquitted the Defendant of Count Eight, rape of a child regarding K.C. The trial court sentenced the Defendant to an effective thirty-four year sentence. This appeal followed.

## I & II

In related issues, the Defendant contends that the evidence is insufficient to support the convictions because the State failed to establish the corpus delicti and that there was a material variance between the proof and the State's election of offenses that denied him a fair trial. The State counters that there was no variance between the elected offenses and the

proof and that the evidence was sufficient to support the convictions. Due to an inadequate election of offenses, the Defendant must receive a new trial for Counts I, II, III, and IV. We conclude, though, that the evidence was sufficient to support the convictions for Counts V, VI, VII, IX, and X.

## A. **Variance**

A variance between information in the indictment and the evidence presented at trial is fatal in Tennessee only if the variance is "material" and "prejudicial" to the defendant. State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984). "Material" means that an essential element of the charge is lacking, such that the allegations and proof do not correspond substantially. See id. "Prejudicial" means a substantial right has been affected: either the defendant was misled at trial and could not prepare a defense or is exposed to a risk of double jeopardy. Id. As our supreme court stated, a variance is not material or prejudicial when "the allegations and proof substantially correspond, the variance is not of a character which could have misled the defendant at trial and is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." Id.

Although stated as a "variance" issue, the nature of the Defendant's complaints are that the State did not provide an adequate election of offenses, that the trial court failed to provide a proper election of offenses instruction, and that the evidence is not sufficient to support the offenses elected. The case before us does not present a variance issue, but we will address the other issues.

## B. **State's Election**

When evidence is presented of multiple offenses that would fit the allegations of the charge, the trial court must require the State to elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. See, e.g., State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1998); State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997); State v. Shelton, 851 S.W.2d 134, 136 (Tenn. 1993); Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973).

> This election requirement serves several purposes. First, it ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement,

-26-

however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000). The requirements of election and a jury unanimity instruction exist even though the defendant has not requested them. See Burlison, 501 S.W.2d at 804. Failure to follow the procedures is considered to be of constitutional magnitude and will result in reversal of the conviction absent the error being harmless beyond a reasonable doubt. See Adams, 24 S.W.3d at 294; see, e.g., Shelton, 851 S.W.2d at 138.

The State elected, and the trial court instructed the jury, as follows:

Count I: This offense reflects the first of the "5-7" incidents, admitted by the defendant in his recorded statement, of putting his finger in [H.C.]'s vagina in the summer of 2006.

Count II: This offense reflects a second incident of the "5-7" incidences, admitted by the defendant in his recorded statement, of putting his finger in [H.C.]'s vagina. This incident would have occurred on a date between 6/1/06 and 1/12/07.

Count III: This offense reflects a third incident of "5-7" incidences of, admitted by the defendant in his recorded statement, of putting his finger in [H.C.]'s vagina. This incident would have occurred on a date between 6/1/06 and 1/12/07.

Count IV: This incident reflects a fourth incident of "5-7" incidences, admitted by the defendant in his recorded statement, of putting his finger in [H.C.]'s vagina. This incident would have occurred on a date between 6/1/06 and 1/12/07.

Count V: This offense reflects the incident described by the defendant in his recorded statement in which he admits "barely" putting his finger in [H.C.]'s vagina in her bed at night.

Count VI: This offense reflects the incident described by the defendant in his recorded statement wherein he admits to touching [H.C,]'s vagina, but denying penetration, in the bathtub the week prior to the MLK weekend of 2007.

Count VII: This offense reflects the first of "2 to 3 to 4" incidences, admitted by the defendant in his recorded statement, of putting his finger in [K.C.]'s anus "2 months to 6 weeks" prior to the MLK Holiday weekend of 2007.

Count VIII: This offense reflects the second incident of "2 to 3 to 4" incidences, admitted by the defendant in his recorded statement, of putting his finger in [K.C.]'s anus "2 months to 6 weeks" prior to the MLK Holiday weekend of 2007.[1]

Count IX: This offense reflects the incident described by the defendant in his recorded statement wherein he admits to putting his finger in [K.C.]'s anus [in the] bathtub as she lay on her side in the water, the week prior to the MLK Holiday weekend of 2007.

Count X: This offense reflects the incident described by the defendant in his recorded statement wherein he admits to touching [K.C.]'s genital area "on the bone" in the bathtub the week prior to the MLK Holiday weekend of 2007.

The Defendant admitting touching and penetrating the victims on various occasions, five to seven times involving H.C., and two to four times involving K.C. The State developed little proof at the trial to differentiate the occurrences by date, location, or other identifying features. The Defendant admitted that he touched both victims "on" their vaginas the week earlier when they were in the bathtub. This corresponds to Counts VI and X. He admitted penetrating K.C.'s anus while she was in the bathtub a week earlier, which corresponds with Count IX. He admitted "barely" penetrating H.C.'s vagina with his finger when she was in her bed at night, which corresponds with Count V.

The remaining counts numerically identify one of multiple instances within the stated time spans. Count I, the first instance of abuse of H.C., took place in the Summer of 2006. The Defendant admitted his abuse of H.C. began in the summertime, but there were no identifying facts such as the location of this first instance of abuse. Count I could have been duplicitous of the instance described by Count V, in which the Defendant "barely" put his finger in the victim's vagina when she was in her bed at night. There was no proof to show whether there were two separate offenses, or only one. Counts II, III, and IV are the second, third, and fourth instances of penetration of H.C. sometime between June 1, 2006 and

---

[1]We note that the jury acquitted the Defendant of Count VIII.

January 12, 2007. There was no evidence of specific, unique facts that would permit the jury to consider each of these counts individually and reach a unanimous verdict as to each.

Counts VII and VIII alleged the first and second instances, respectively, of digital-anal penetration of K.C. two months to six weeks before Martin Luther King, Jr. Holiday. The jury acquitted the Defendant of Count VIII. The Defendant admitted that he penetrated K.C.'s anus with his finger two, three, or four times beginning six weeks to two months before his admission to Melanie Clark. By acquitting the Defendant of one of the two non-specific counts and convicting him of one non-specific count, the jury determined that the State had proven only one instance of abuse in the six weeks to two month period. Although the danger of a non-unanimous "patchwork" verdict arises when there is evidence of two or more offenses, Counts VII and VIII were designated as the "first" and "second" occurrences within the time period. Considering that no unique facts were presented as to Counts VII and VIII and that the jury rejected that sufficient evidence existed of a "second" offense (Count VIII), the jury verdict that the Defendant was guilty of the "first" offense (Count VII) was unanimous. Cf. Adams, 24 S.W.3d at 294 (stating, in the context of continuing offenses, that "[w]hen the evidence does not establish that multiple offenses have been committed . . . the need to make an election never arises."). Any election error as to Counts VII and VIII was harmless beyond a reasonable doubt.

## C. Jury Instructions

The Defendant argues that "the State failed to properly instruct the jury on the Election of Offenses so that the verdict of every juror would be united on the one offense" but does not state specific deficiencies in the instructions given. After the trial court identified the elected offenses in the manner we have noted, it instructed the jury:

> The factual elections made by the State to support each count of the indictment and the Court's acceptance of these elections is no indication that these elections are true or that the Court has expressed in any manner an opinion as to their validity or the weight you should give to any evidence introduced in support of these elections. As the sole trier of the facts in this case, you and you alone must determine whether the State has proven beyond a reasonable doubt that the incident specified in the election for each offense occurred.
>
> For you to find the defendant guilty of any particular count of the indictment, each of you must base your finding on

the single and specifically identified incident elected by the State for that count.

Although this instruction is not a verbatim recitation of Tennessee Pattern Instruction–Criminal 42.25 regarding election of offenses, its substance was such as to impart the essential information to the jury. There was no error regarding the instruction.

## D. Sufficiency of the Evidence

Because the State failed to make an adequate election for Counts I, II, III, and IV, we are unable to review the sufficiency of the evidence for them. See, e.g., Shelton, 851 S.W.2d at 137 ("[A]n appellate court asked to review the legal sufficiency of the evidence can hardly be confident that it has discharged its function properly, in the absence of an election."). We are able, however, to review the evidence for Counts V, VI, VII, IX, and X.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Corpus delicti means "the body of the crime." State v. Shepherd, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). The two elements necessary to prove the corpus delicti are "(1) that a certain result has been produced, for example, a man has died or a building has been burned, and (2) some person is criminally responsible for the act." Wooten v. State, 203 Tenn. 473, 481, 314 S.W.2d 1, 5 (1958). Our supreme court has held that:

> [W]hile the corpus delicti cannot be established by confessions alone, yet the confessions may be taken in connection with other evidence, direct or circumstantial, corroborating them, and, if from all of the evidence so considered together the corpus delicti and the guilt of the person with reference thereto is established beyond a reasonable doubt, it is the duty of the jury to convict.

Ashby v. State, 139 S.W. 872, 875 (1911).

For rape of a child as charged by Counts V, VII, and IX, the State was required to show that the Defendant engaged in unlawful sexual penetration with a victim older than three but younger than thirteen years old. T.C.A. § 39-13-522(a) (Supp. 2005, 2006, & Supp. 2007) (amended 2011). "'Sexual penetration means' sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Id., § 39-13-501(7) (2010).

For aggravated sexual battery as charged by Counts VI and X, the State was required to prove that the Defendant engaged in unlawful sexual contact of a victim less than thirteen years old. T.C.A. § 39-13-504(a)(4) (2010). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, if that touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id., § 39-13-501(6).

With regard to Count V, the evidence viewed in the light most favorable to the State demonstrates that the Defendant admitted to Ms. Clark that he put his finger in H.C.'s vagina while H.C. was in bed. With regard to Count VII, the Defendant admitted that he penetrated K.C.'s anus with his finger two, three, or four times in the previous six weeks to two months. With regard to Count IX, he admitted he inserted his finger in K.C.'s anus when the victims were in the bathtub about a week earlier. With regard to Counts VI and X, he admitted touching both victims on their vaginas when they were in the bathtub the week before the Martin Luther King, Jr. holiday. Subject to corroboration, the Defendant's statements to Ms. Clark provide sufficient evidence of each of these offenses.

Only slight proof is required to establish the corpus delicti. State v. Smith, 24 S.W.3d 274, 281 (Tenn. 2000). The evidence that corroborates the Defendant's inculpatory statements includes: Both victims testified that the Defendant touched their genital area, which they identified on an anatomical diagram. K.C. said that the Defendant touched both the front and back of her genital area and that he touched her skin. H.C. said the Defendant touched her "in [her] private area." The abuse was discovered after then-four-year-old H.C. put the Defendant's finger on her genital area while in the presence of family members. The Defendant's admissions of guilt were corroborated by this other proof.

In so holding, we considered whether each of the offenses must be separately corroborated and have concluded that such is not required. In State v. Rickman, our supreme court noted the general ban on evidence of similar crimes because of the danger of the evidence being misused to show the defendant's propensity to commit the crime on trial. 876 S.W.2d 824, 828-29 (Tenn. 1994); see Tenn. R. Evid. 404. The Rickman court recognized, though, that in a trial involving sex crimes occurring over a period of time, proof of one such offense was necessarily relevant and could be considered as corroborative proof of another,

-31-

provided that the offenses both occurred within the time period alleged in the indictment. Rickman, 876 S.W.2d at 828-29; see State v. Ellis, 89 S.W.3d 584, 600 (Tenn. Crim. App. 2000). Although the proof in this case does not include corroboration of every element of each conviction offense as to each victim, the victims' testimony identifying specific incidents during the time period alleged by the indictment sufficiently corroborated the Defendant's admissions that he touched the victims and penetrated them digitally. The State presented sufficient proof to support the convictions.

The Defendant must receive a new trial on Counts I, II, III, and IV. The evidence is sufficient to support the convictions for Counts V, VI, VII, IX, and X.

### III

The Defendant contends that the trial court erred in admitting evidence of the conversations he had with his wife on January 18, 2007, because the confessions recorded by the police were involuntary and coerced. The State counters that the trial court properly denied the motion to suppress. We agree with the State.

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law, which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled . . . to be a witness against himself" in a criminal case. U.S. Const. Amend. V. Similarly, article I, section 9 of the Tennessee constitution provides that an accused "shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citing State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994)); see State v. Northern, 262 S.W.3d 741 (Tenn. 2008). For a confession to be considered voluntary, it must not be the product of

"'any sort of threats or violence, . . . any direct or implied promises, however slight, nor by the exertion of any improper influence.'" State v. Smith, 42 S.W.3d 101, 109 (Tenn. Crim. App. 2000) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)). The essential question therefore is "'whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . .'" State v. Kelly, 603 S.W.2d 726, 728 (1980) (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961)). The Supreme Court has held that in order for a confession to be involuntary, it must be the product of coercive state action. See, e.g., Colorado v. Connelly, 479 U.S. 157, 163-64 (1986).

The trial court found that Ms. Clark was a state actor because she and the police were complicit in obtaining the Defendant's admissions. The court found, however, that the Defendant's free will was not overborne by Ms. Clark's actions. The court also determined that although Ms. Clark made misrepresentations about their future together and implied that she would not seek prosecution, she had no authority to forego prosecution or allow leniency. The court found, as well, that she did not misrepresent the evidence and did not threaten the Defendant because her statements that she would go to the police and obtain a medical examination of the victims unless the Defendant told the truth were statements of fact. The court noted that although the Defendant erroneously placed his trust in Ms. Clark, the evidence did not support a conclusion that the Defendant's decision to confess was prompted by his misplaced trust, rather than by "the realities of the situation." The court noted, as well, that the Defendant told Ms. Clark to "go ahead" with her plans to have the victims examined and to call the police because he had done nothing wrong. The court also noted the Defendant's offer to undergo a polygraph examination. The court found it significant that the Defendant's first affirmative, unqualified admission occurred in the second statement without prompting from Ms. Clark, after he had time to reflect following the first conversation.

In State v. Branham, 855 S.W.2d 563 (Tenn. 1993), our supreme court considered the admissibility of a defendant's surreptitiously recorded confession to a family member who visited the defendant in jail. The court said that the question of coercion must be considered from a defendant's perspective. Id. at 568; cf. State v. Smith, 933 S.W.3d 450, 455 (Tenn. 1996) (stating that the defendant's subjective perception alone is not sufficient to justify the conclusion that confession was not voluntary and that coercive police activity must also be shown). A defendant's statement to someone who is secretly assisting the State does not implicate the "police-dominated atmosphere" and coercion concerns that were addressed in Miranda v. Arizona. Branham, 855 S.W.2d at 568. Thus, a Defendant's federal and state constitutional rights to be free from compelled self-incrimination are not violated simply because a person acting at the State's behest elicits incriminating information from a

Defendant. Id. at 569. Coercion of a suspect is distinguished from strategic deception. Branham, 855 S.W.2d at 568 (citing Perkins, 496 U.S. 292, 296-97 (1990)).

Regarding the present case, the evidence does not preponderate against the trial court's determinations. The Defendant was unaware that Ms. Clark was acting in conjunction with Detective Zoccola. Although Ms. Clark was deceptive with the Defendant, her misrepresentations were about their personal life, not whether the State would prosecute him if he did not confess or afford him leniency if he confessed. Even if she had made such representations, she had no authority as a private citizen to do so. Proof of Ms. Clark's deception of her husband does not equate to proof that he was coerced by the police. See Perkins, 496 U.S. at 296-97. Likewise, the evidence does not preponderate against the trial court's finding that the Defendant's free will was not overborne by Ms. Clark's actions. The Defendant vehemently and repeatedly denied any wrongdoing before eventually admitting his misconduct. To support his initial protestations of innocence, he offered to take a polygraph examination and encouraged Ms. Clark to have the victims examined by a doctor. After the Defendant's telephone conversations with Ms. Clark, several hours passed in which he had time to consult with his mother and consider whether to admit additional instances of misconduct and to provide factual details about the abuse.

We note that this court has rejected claims similar to the Defendant's. See State v. Ted Ormand Pate, No. M2009-02321-CCA-R3-CD, Davidson County (Tenn. Crim. App. Nov. 22, 2011) (declining to find plain error from the defendant's claim that his admissions were coerced by his daughter, who was also the victim's mother, who made a "controlled call" under the direction of a police detective), perm. app. denied (Tenn. Apr. 11, 2012); State v. Robert Bacon, No. 03C01-9608-CR-00308, Sullivan County (Tenn. Crim. App. Jan. 8, 1998) (holding that the defendant's state and federal constitutional rights were not violated by surreptitious recording of telephone conversations between the defendant and the victim when the calls were made by the victim under the State's direction); cf. State v. Smith, 933 S.W.2d 450, 454-56 (Tenn. 1996) (rejecting the defendant's claim that his admissions were coerced by a social worker's statements that the district attorney general might not prosecute the defendant if he were truthful and received counseling and noting that the social worker's statements could not reasonably be interpreted as a promise that the Defendant would not be prosecuted). The Defendant is not entitled to relief on the basis of the Fifth Amendment or article 1, section 9.

The question which remains is whether due process was offended by the interrogation method. The Fourteenth Amendment of the United States Constitution and article I, section 8 of the Tennessee Constitution provide that the State shall not deprive any person life, liberty, or property except by due process of law. U.S. Const. Amend. XIV; Tenn. Const. art. 1, § 8. "The true test . . . is whether 'fundamental fairness' and 'substantial justice' . . . are

absent or present. Van Zandt v. State, 402 S.W.2d 130, 135 (Tenn. 1966); see State v. Smith, 933 S.W.2d 450, 457 (Tenn. 1996). The court in Branham did not rule out the possibility that some interrogation practices might be so unfair as to offend due process. Branham, 855 S.W.2d at 569.

To the extent that the Defendant contends that the method employed to elicit his admissions was so inherently unfair that it violates due process, we note the lack of proof that Detective Zoccola directed Ms. Clark to promise the Defendant he would not be prosecuted or that he would receive leniency from the State, nor did she, as a private citizen, have the power to do so. We distinguish this case from State v. Phillips, 30 S.W.3d 372 (Tenn. Crim. App. 2000), in which the defendant gave an involuntary and coerced statement to an investigator and another employee of the Department of Children's Services following the investigator's false statements about the evidence, repeated denials by the Defendant, statements that the police would be involved unless the Defendant confessed, and assurances that the Defendant and the victim would receive treatment only if the Defendant confessed. The Defendant is not entitled to relief.

**IV**

The Defendant contends that the trial court erred in admitting evidence of the Defendant's use of pornography depicting adults. The State contends that the trial court did not err in admitting the evidence. We conclude that the trial court erred in admitting the evidence during the State's case-in-chief but that the error was harmless.

In the recorded conversations, the Defendant said, in the context of denying that he sexually abused the victims, "[T]he only problem I have had is occasionally looking at some pornography. It never included any child pornography." He admitted that although Ms. Clark asked him to refrain from viewing pornography, he continued to do so without her knowledge, and that he masturbated while viewing pornography.

The Defendant filed a pretrial motion in limine seeking exclusion of the evidence on the bases that it was not relevant, that it was unfairly prejudicial, and that it would confuse the issues before the jury. The record reflects that the Defendant's case went to trial and that a mistrial was declared, but the record does not contain a transcript of the trial or any hearing on the motion in limine regarding pornography. This appeal is from the Defendant's convictions at the second trial. With regard to what transpired before the first trial, defense counsel stated at the hearing on the motion for a new trial after the second trial, "The Court ruled before the first trial that some of [the evidence of pornography use] was excluded, but then some of it naturally came in sort of as the [res gestae] of the discussion between the parties." Before the second trial, the defense filed a notice that it intended to introduce

-35-

expert testimony regarding whether the Defendant had a highly compliant personality and was unusually susceptible to making a false confession.

The court conducted a hearing to determine if the defense expert's testimony was admissible. Dr. Walker's testimony at the hearing was consistent with his trial testimony, which we have recounted previously. The court ruled that Dr. Walker's testimony was admissible, stating that the expert could testify about "the environments that exist in an interrogative atmosphere that can lead to false confessions, so that the jury can determine whether or not any of those existed in this case . . . [n]ot specifically commenting on what [Ms. Clark] did that may have caused it, I think that's up to the jury to decide." With respect to the evidence of the Defendant's pornography use, the court noted:

> As a corollary to [the question of admissibility of the expert testimony], on the issue of pornography, I think in light of my ruling on this that it becomes relevant because one of the bases that the doctor forms his opinion on is that Ms. Clark was the dominant party in this and that he kind of gives in to whatever her opinions are on things in order to avoid conflict . . . between him and her, he basically succumbs to her desires, demands, however you want to interpret it; he knows very well her position on pornography throughout their marriage, he not only ignored her desires on that, once caught, took subversive action to continue to do so, and . . . I will give a limiting instruction of how they can use it, certainly can't use it to determine whether - even though it's not technically 404(B), it's not second technically prior bad acts, it's totally legal, I will still give a limiting instruction that they cannot consider it propensity evidence and the standard language. But I think it goes to the issue as to whether or not he was a submissive partner in this relationship because it tends to show that he was doing things contrary to her very strong beliefs on the topic, this wasn't just, you know, "I want you to take out the trash on Monday before they pick it up on Tuesday, and I don't want to have to tell you about that anymore," this was something that she felt extremely strong about in her convictions that it was not to be tolerated and he chose to, even though that was a very, I guess, almost like in [the] Catholic church, you have venial and cardinal sins, I mean, this was high on her ranking of things you do not do in this marriage, and he not only chose to violate that principle of hers, he in some ways he subterfuge [sic] in order to carry it out, and

so I think it's relevant to that issue for the jury to fully evaluate the relationship of the parties in this particular marriage so I will allow that testimony for that purpose.

After Ms. Clark's testimony, the court provided a limiting instruction:

> Members of the jury, there has been testimony that Mr. Clark viewed legal adult pornography during the course of his marriage to Mrs. Clark, you're instructed that you cannot consider this evidence to prove that Mr. Clark had a disposition or predisposition to commit the offenses for which he is on trial.
>
> This evidence and the circumstances surrounding its occurrence may be considered by you only for the limited purpose of providing you a more complete picture of the parties' relationship and evaluating their credibility.

The court gave a similar instruction after Detective Gish testified about the discovery of pornographic images on the Defendant's computer.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm'n Notes).

When relevant evidence reflects on the defendant's character, however, the trial court must apply the more rigorous standard of Tennessee Rule of Evidence 404(b), rather than Rule 403. State v. James, 81 S.W.2d 751, 758 (Tenn. 2002); State v. Dubose, 953 S.W.2d 649, 655 (Tenn. 1997). Rule 404(b) prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. Id.; State v. McCary, 119 S.W.3d 226, 243

(Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

The Defendant challenges the admission of any evidence of his pornography use. The record does not contain the trial court's ruling on the limits of this evidence at the first trial. We note that the Defendant's notice of intent to call Dr. Walker as an expert witness was filed after the first trial. In the context of the second trial, the court's ruling on the pornography use evidence was intertwined with the question of admissibility of Dr. Walker's testimony. Evidence of the Defendant's pornography use was offered as part of the State's case-in-chief at the second trial. Evidence of a defendant's other acts may be subject to exclusion under Rule 404(b) until the defendant "opens the door" to the evidence by introducing other evidence or through cross-examination of a State's witness. See Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][j] (6th ed. 2010). In this case, though, the State offered evidence of Defendant's pornography use before Dr. Walker testified as a defense witness.

We conclude that the trial court erred in admitting evidence of the Defendant's use of pornography during the State's case-in-chief. Evidence of the Defendant's use of pornography had the potential for misuse by the jury as propensity evidence. The evidence qualified as "other acts" evidence under Rule 404(b). The trial court complied with the requirements for determining admissibility under the rule. See Tenn. R. Evid. 404(b)(1). The recordings of the conversations, including the Defendant's admissions of pornography use, provided clear and convincing proof of pornography use. See id. at (b)(3). We note, though, that the evidence was not material, and its probative value was outweighed by the

danger of unfair prejudice. See Tenn. R. Evid. 404(b)(2), (4); see also State v. Rodriguez, 254 S.W.3d 361 (Tenn. 2008) (holding that the trial court erred in admitting evidence in trial for rape of a child and aggravated sexual battery that the defendant possessed child pornography).

The question becomes whether the error more probably than not affected the verdict. See T.R.A.P. 36(b). In that regard, we consider the trial court's ruling that the evidence was relevant and admissible in light of the defense proof that the Defendant was susceptible to making false confessions while under the domination of Ms. Clark. As we have noted, the court found that the evidence was relevant to the material issue of whether the Defendant was submissive and coerced to confess falsely to the crimes by his wife. The court found that the danger of unfair prejudice did not outweigh the probative value of the evidence. Once the defense offered evidence of the Defendant's submissiveness to Ms. Clark and his predisposition to confess falsely, evidence of his secret defiance of Ms. Clark's strong wishes that he not use pornography was relevant and probative. The evidence addressed whether the Defendant was the submissive partner in their marriage whose will was overborne by the dominant partner such that he falsely confessed to sexual abuse of the victims.

We distinguish this case from Rodriguez. In Rodriguez, the supreme court held that the trial court erred in admitting evidence that the defendant possessed child pornography in a trial for rape of a child and aggravated sexual battery charges. In that case, however, the prosecutor offered the evidence that the defendant possessed child pornography on the basis that it "goes to motive and intent to show that he has a thing for children." In other words, the evidence was offered to show the defendant's propensity to commit the crimes. The court held that the erroneous admission of the evidence more probably than not affected the verdict. Rodriguez, 254 S.W.3d at 374-78.

We view the facts of the present case as less compelling than those in Rodriguez. The Defendant in this case possessed legal adult pornography, not illegal child pornography. The evidence was not offered to show the Defendant's propensity to commit child sexual abuse, and the jury was specifically admonished that the evidence should not be used for that purpose. The evidence was relevant to the defense theory that the Defendant was not guilty of the crimes and that he confessed falsely when pressured to do so by a domineering spouse. The focus of the evidence was on the Defendant's deception of Ms. Clark as it reflected on his role in the marital relationship. The evidence was not offered to reflect unfavorably on his character because he viewed pornography or to show a disposition toward sexually abusing children. Although the trial court erred in admitting the evidence in the State's case-in-chief, the evidence of the Defendant's deception of Ms. Clark became relevant and material during the defense proof and, at that point, the danger of unfair prejudice did not

outweigh its probative value. The trial court's error in admitting the evidence during the State's case-in-chief was harmless. The Defendant is not entitled to relief.

V

The Defendant contends that the trial court erred in allowing Detective Zoccola's testimony about his opinion of the Defendant's truthfulness. The State counters that the trial court gave an appropriate instruction that the jury could not consider Detective Zoccola's opinion in deciding whether the Defendant committed the crimes alleged. The State notes the absence of a contemporaneous objection and contends that further relief is not warranted. We conclude that the Defendant has not shown harmful error.

Detective Zoccola testified about questioning the Defendant. His direct examination reflects the following:

> Q. During that two-hour discussion, did Mr. Clark make any admissions about having touched his children?
>
> A. He did not.
>
> Q. And did he in fact retract any admissions that he had made during the call and the conversation [in the car]?
>
> A. He did.
>
> Q. Did you confront Mr. Clark about the statements that he made?
>
> A. Yes.
>
> Q. Did you indicate to him that you didn't believe him?
>
> A. Several times.
>
> Q. Did you outline for him the potential consequences for his activity?
>
> A. We discussed that he was facing some very serious charges that carried some very long jail time and that while it didn't get any more serious than that, we discussed what, in my

-40-

opinion, would be his best option and we certainly had the benefit of the phone call and the body wire and heard him talk to his wife about these things, I certainly felt like that was complete honesty on his part and we discussed, you know, what could happen or what might happen, just trying to get him to talk.

Q.    Mr. Zoccola, you said you outlined the potential consequences that were facing Mr. Clark and did you provide him some advice regarding what he might do in this situation?

A.    We were speaking in general terms, I'm not a district attorney, I couldn't tell him exactly what he was looking at, but certainly that it was very serious and stressed several times that, in my opinion, I thought that if he were honest and basically be [sic] truthful about what happened between himself and the girls that the district attorney's office and the DA handling this case might cut him some slack or might–might be in his best interest to be completely honest and own up to it.

Q.    You told him basically it would help him if he admitted to what he had done?

A.    Yes.

Q.    You believed Ms. Clark and you believe what he said on the tape?

A.    Absolutely.

Q.    And you told him that you wanted him to admit?

A.    Yes.

Following this testimony, court adjourned for the day. The next day, defense counsel objected to the question and answer regarding whether Detective Zoccola believed the Defendant's statements on the tape. The court said it would provide a curative instruction. Following Detective Zoccola's cross-examination, the court instructed the jury:

Members of the jury, yesterday afternoon, you heard an opinion given by Detective Zoccola regarding his belief as to the truth and veracity of the confession that he heard during the course of these recorded statements; I am instructing you and making it clear that you cannot consider his opinion as to the truth and veracity of these statements for any reason whatsoever in terms of whether or not they are true. You are the sole judges of the facts in this case and the credibility of these witnesses, you and you alone will make the determination as to whether or not those statements, those recordings are true. You may consider what he testified to in that regard as to give you a better understanding of his motivation and the actions that he continued to take during the investigation of this case.

As a preliminary matter, we disagree with the State's summary argument that the Defendant did not make a contemporaneous objection and is not entitled to further relief. Detective Zoccola's testimony in question was at the end of his direct examination. Court adjourned for the day, and defense counsel objected the following morning before the court received further proof. To the extent that the State's argument may be construed as a claim that the Defendant waived any objection to the admission of the evidence, we conclude that the objection was not waived.

The Defendant argues that the evidence was inadmissible because it was not relevant and because Detective Zoccola had no personal knowledge whether the Defendant was telling the truth. See Tenn. R. Evid. 401 (relevance), 602 (lack of personal knowledge). We agree. We must consider, then, whether the error more probably than not affected the verdict. See T.R.A.P. 36(b). Upon review, we conclude that the error was harmless. The improper questioning was brief and was not emphasized. The trial court gave a proper curative instruction. The jury is presumed to have followed the trial court's instructions. See, e.g., State v. Sims, 45 S.W.3d 1, 22 (Tenn. 2001) (appendix consisting of excerpts of Court of Criminal Appeals' opinion); State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). The Defendant is not entitled to relief.

## V

The Defendant contends that the trial court erred in instructing the jury on the mental state of recklessness for the counts involving rape of a child. The State contends that the trial court properly instructed the jury. We conclude that the trial court properly instructed the jury.

The record reflects that with regard to the elements of child rape, the trial court instructed the jury that the State was required to prove that the Defendant "acted either intentionally, knowingly or recklessly." "[The] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). The trial court must describe each element of an offense and define the element in connection with that offense. See State v. Cravens, 764 S.W.2d 754, 756 (Tenn. 1989). A charge is prejudicial error if it fails to "submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).

This court has reached inconsistent results when faced with the question of whether the mens rea element for rape of a child is satisfied by a showing of recklessness, and our supreme court has yet to address the issue directly. See State v. Johnny Lynn, No. M2008-00532-CCA-R3-CD, Perry County (Tenn. Crim. App. June 25, 2009) (noting the split of authority and the lack of a supreme court ruling), perm. app. denied (Tenn. Sept. 1, 2009); State v. Joel E. Blanton, No. M2007-01384-CCA-R3-CD, White County (Tenn. Crim. App. Mar. 4, 2009), perm. app. denied (Tenn. Aug. 24, 2009) (noting the split of authority); cf. State v. Maddin, 192 S.W.3d 558, 562 (Tenn. Crim. App. 2005) (denying plain error relief from aggravated rape convictions because there were no facts to support a finding of a reckless mens rea); Wesley Earl Brown v. State, No. M2008-01923-CCA-R3-PC, Davidson County, slip op. at 15-18 (Tenn. Crim. App. June 22, 2010) (stating that rape of a child may be committed intentionally, knowingly, or recklessly), perm. app. denied (Tenn. Nov. 10, 2010); State v. Thomas D. Stricklin, No. M2005-02911-CCA-R3-CD, Putnam County, slip op. at 17-21 (Tenn. Crim. App. Apr. 5, 2007) (stating that rape of a child may be committed intentionally, knowingly, or recklessly), perm. app. denied (Tenn. Aug. 20, 2007); State v. Chester Wayne Walters, No. M2003-03019-CCA-R3-CD, White County, slip op. at 14-15 (Tenn. Crim. App. Nov. 30, 2004) (stating that rape of a child may be committed intentionally, knowingly, or recklessly), perm. app. denied (Tenn. Mar. 31, 2005). But cf. State v. Charles L. Williams, No. M2005-00836-CCA-R3-CD, Davidson County, slip op. at 24-30 (Tenn. Crim. App. Nov. 29, 2006) (Welles, J., minority opinion as to the issue) (asserting that reckless mens rea does not apply to rape of a child); State v. Weltha Womack, No. E2003-02332-CCA-R3-CD, Knox County, slip op. at 11-13 (Tenn. Crim. App. Jan. 4, 2005) (holding that the trial court erred in charging the jury that it could find the defendant guilty of aggravated rape, consisting of rape of a child less than thirteen years old, based upon proof of reckless sexual penetration).

We believe the better position is stated in previous opinions of this court holding that rape of a child can be intentional, knowing, or reckless. See, e.g., Chester Wayne Walters, slip op. at 14-15. We note State v. Parker, 887 S.W.2d 825, 826-28 (Tenn. Crim. App. 1994), which held that a defendant's mens rea for aggravated rape and aggravated sexual battery was satisfied by a showing of his reckless belief that the victim was at least thirteen

years old. We also note that our supreme court has said, albeit in the context of a double jeopardy analysis, that a defendant may commit rape of a child with a reckless mens rea. State v. Barney, 986 S.W.2d 545, 550 (Tenn. 1999). Similarly, the supreme court has said in the context of a challenge to the sufficiency of the indictment that aggravated rape, consisting of rape of a child less than thirteen years old, could be committed with an intentional, knowing, or reckless mens rea. State v. Hill, 954 S.W.2d 725, 729 (Tenn. 1997). We conclude that the trial court did not commit instructional error. The Defendant is not entitled to relief.

**VI**

The Defendant contends that the trial court erred in sentencing by using an inapplicable enhancement factor and in imposing consecutive sentences. The State contends that the sentences are proper. We agree with the State.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "'the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991)). In this respect, for the purpose of meaningful appellate review, the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994); see T.C.A. § 40-35-210(e) (2010).

Also, in conducting a de novo review, we must consider (1) any evidence received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) statistical information

provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee, (7) any statement that the defendant made on his own behalf, and (8) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210; see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236 (Tenn. 1986). The record reflects that the trial court followed the appropriate procedures in sentencing.

At the sentencing hearing, Ms. Clark testified about the effect the crimes had on the victims. She said that the victims had a "normal life" until the crimes occurred. She said that in the past three years, the victims had been in an "emotional state" and had asked "pitiful questions . . . to try to justify what's happened." She said the victims' behavioral changes included severe depression and crying despite not being able to explain why they were crying. She said the victims' sleeping habits changed after the Defendant left the home. She said she and the victims had trusted the Defendant.

Ms. Clark testified that H.C. told her of incidents of sexual abuse in addition to those that were presented at the trial. She said H.C. began putting cotton swabs in her ears when she was upset. She said H.C.'s teacher spoke with her about H.C.'s inability to focus in class. She said that H.C. had severe anxiety and had a panic attack at school one year earlier. She said that H.C. wrote notes stating that she loved her father but wondered why he committed the crimes and why he did not love her. She said she had been concerned for H.C. at times because of H.C.'s level of distress. She described an incident after the Defendant's first trial when H.C. threatened to hurt herself and Ms. Clark and had to be physically restrained until she fell asleep.

On cross-examination, Ms. Clark testified that since January 2007, the victims attended rape and sexual assault counseling every one to three weeks. She acknowledged that the judge in her divorce proceedings admonished her that she was "turning [her] children into rape victims." She said that the months before January 2007 were among the best in her marriage to the Defendant.

On questioning by the court, Ms. Clark testified that after negative comments were made about the rape and sexual assault center, she sought another counselor for the victims, but the victims wanted to stay with their familiar counselor. She said that K.C., who was seven years old, showed signs of post-traumatic stress and anger. She said that the Defendant's church involvement began after January 2007. Ms. Clark read a letter she wrote to the court that described the effects of the crimes and the legal proceedings on her family, and particularly the victims.

Michelle "Shelly" DeMarsilis testified that she was a licensed clinical therapist at the Sexual Assault Center, which was formerly the Rape and Sexual Abuse Center. She said she

had a master's degree, completed a two-year internship in order to become licensed, and had been licenced for ten years. She said she used a non-directive approach in counseling sessions, meaning she did not ask leading questions. She said she had been trained in means to avoid inadvertently causing children to make false accusations. She said that the victims needed weekly counseling and that Ms. Clark had not pursued counseling unnecessarily.

Ms. DeMarsilis testified that she began counseling the victims in February 2007. She said that H.C. was the first of the victims to reveal acts of sexual abuse to her. She said H.C. revealed the information bit-by-bit over time. She said the victims exhibited traits she associated with sexual abuse, including emotional damage, nightmares, fear of being taken from their home by the Defendant, crying, mood swings, poor concentration, anger, and physically fighting with each other. She said that children sometimes became physical or hid during a post-traumatic flashback. She recalled a counseling session in which H.C. was angry, fought with K.C., ran from the office, hid under a table, and cried. She said that self-destructive behaviors, such as H.C.'s putting swabs in her ears, was characteristic of a child who was trying to gain control of her emotions. She said that H.C. picked her ears with swabs until her ears bled. She said that due to H.C.'s difficulties, she encouraged Ms. Clark to obtain a psychiatric medication evaluation. She said that based upon her experience, H.C.'s and K.C.'s emotional and psychological injuries were severe. She said that sexual abuse by a family member or over time could be more traumatic for children.

On cross-examination, Ms. DeMarsilis testified that the number of times she had counseled the victims might be in the seventies or eighties. With regard to a document she prepared for the court, she acknowledged that the list of future effects of child abuse applied to children generally. On questioning by the court, Ms. DeMarsilis testified that she obtained some of her information about the victims from third parties, such as a school counselor or family member. She said that the victims' statements about the abuse was consistent with approximately ten occurrences. She said she observed several long-term effects of the abuse in the victims: self-blame, anger, grief, loss, betrayal by a trusted person, and poor self-image. She said H.C. had been suicidal, as well. She thought the victims would be "in and out of therapy for a long time."

Mike Williams testified that he knew the Defendant from a men's group at Bellvue Community Church and that the Defendant had been involved in community outreach projects. He described the Defendant as "a class act" and "a nice guy." On cross-examination, Mr. Williams testified that he had known the Defendant for about three years. He did not know if the Defendant participated in Bible study or service projects before January 2007.

Kimberly Clark, the Defendant's sister, testified that she and the Defendant were raised in a loving home. She said they attended church regularly until their parents' restaurant business interfered. She said the Defendant attended sporadically until she suggested he attend Bellvue, where she and their mother attended. She said the Defendant participated in church service projects. She said that before attending Bellevue, the Defendant sometimes attended another church with his then-wife and her family. She said that she and the Defendant lived with their mother.

Kimberly Clark testified that she and her mother relocated from Florida to Tennessee after the Defendant and Melanie Clark announced that they were expecting their first child. She said they did so in order to be involved with the family. She said that they all vacationed together and that she participated in other recreational activities with the Defendant and the victims. She said that the Defendant was involved with the victims' daily lives, that he was the primary cook of the household, that he attended school functions, and that he loved the victims. She said the Defendant was devastated that he had been away from the victims for the past three years. She said the Defendant had strong support from his friends, coworkers, and family. Ms. Clark read a letter she wrote to the court in which she stated her belief that the Defendant was a good father and requested leniency for him.

Janet Clark testified that after the victims were born, she spent as much time as possible with them. She said she babysat whenever she was asked. She said that she was at their home alone with them and that she took them to other destinations. She never saw any signs of sexual abuse, nor did either of the victims mention it. She said she had been awarded grandparent visitation beginning in February 2008. She was allowed to see the victims once a week for an hour in a psychiatrist's office. She was required to pay $120 per visit. The visits were later changed to once every two weeks for two hours at a different location. She said that in the eighteen-month period of grandparent visitation, the victims were happy and did not appear depressed or traumatized. A photograph album containing photographs she took of the victims was received as an exhibit.

The presentence report reflects that the then-thirty-seven-year-old Defendant had a bachelor's degree and no criminal history. He had a history of steady employment. The court received letters from the Defendant's ex-wife and her family members, Ms. DeMarsilis, Ms. Barnard, Mr. Jordan, and H.C.'s teacher. The trial court stated that it had read approximately fifty letters written on the Defendant's behalf, although the documents were not included in the appellate record that has been transmitted to this court.

After receiving the evidence, the trial court found that the Defendant abused a position of trust. See T.C.A. § 40-35-114(14) (2010). The court noted that violation of trust was significant in light of the paternal relationship between the victims and the Defendant. The

court also found that the victims were particularly vulnerable due to their ages of four and six and in view of their trust relationship with the Defendant. See id. at -114(4). In this regard, the court found it significant that the Defendant used the ruse of "digging for treasure" and told the victims that it was their secret in order to make his abuse seem like a game. The court stated that this approach would not have worked with an older child.

With regard to mitigating factors, the court rejected a finding that the Defendant's conduct did not cause or threaten serious bodily injury. Id., § 40-35-113(1) (2010). The court noted, however, the Defendant's favorable background, including his employment history and lack of a criminal history. The court noted that the Defendant's emotional and financial support of his family was generally a favorable factor but that given the nature of the crimes, the court would not give any mitigating weight to the factor.

The trial court found that despite the presence of significant mitigating factors, the breach of trust involved in the Defendant's offenses was "particularly egregious" and made even more so by the ages of the victims. The court sentenced the Defendant to seventeen years for each count of rape of a child and to ten years for each count of aggravated sexual battery.

In considering whether the sentences would be served concurrently or consecutively, the court noted that the offenses involved more than one victim. See id., § 40-35-115(b)(5). The court stated that the severity of the crimes was exacerbated by the parental relationship and the residual psychological impact on the victims. The court noted that H.C. in particular was significantly affected by the crimes. The court said, however, that the time span of the offenses and the nature and the scope of the sexual acts involved, while unacceptable, were not particularly egregious compared to other child sexual abuse cases. The court found that the relationship of the parties and the residual impact outweighed the other factors and imposed partially consecutive sentences. The sentences for each victim were imposed concurrently with each other, yielding a seventeen-year sentence for the offenses against each victim. The sentences for the two victims were imposed consecutively, netting an effective thirty-four-year sentence.

## A. Length of Sentences

The Defendant contends that the trial court erred by applying the enhancement factor for particularly vulnerable victims because the evidence used to support the factor had been excluded in the court's ruling on a pretrial motion in limine. The Defendant has not specified the evidence he claims was erroneously considered, nor has he provided a citation to the record for the trial court's ruling excluding it. Tennessee Code Annotated section 40-35-

114(4) provides for enhancement of a defendant's sentence upon proof that "[a] victim of the offense was particularly vulnerable because of age or physical or mental disability[.]"

The trial court applied the particularly vulnerable victims factor based upon the victims' ages of four and six and on the Defendant's use of game-like ruses involving buried treasure and keeping secrets that worked because of the victims' ages. The evidence of these facts came from Ms. Clark's statements in the recorded conversations she had with the Defendant. We note that the recordings of the Defendant and Ms. Clark's conversations played at trial were abbreviated. The record does not contain a transcript of a hearing or a written order addressing redaction of the recordings in this regard. As we have stated, the ruling appears to have been made before the first trial, with the parties relying in the second trial on the court's previous ruling. In any event, the unabridged conversations appear in the record. In them, Ms. Clark stated that the victims said the Defendant's actions were "a secret game" and that K.C. reported that "it was like a treasure hunt." We do not know whether the evidence was excluded by agreement of the parties or by trial court ruling. If the latter, we do not know the basis for exclusion. If the basis was that the evidence was hearsay, we note that reliable hearsay evidence may be admissible at a sentencing hearing. See T.C.A. § 40-35-209(b) (2010). We note, as well, that the Defendant did not object to the trial court's reliance on the evidence at the sentencing hearing.

In any event, the record provides independent support for application of the enhancement factor. At the time of the crimes, K.C. was four years old and H.C. was five and six years old. The Defendant was their father. There was proof that some of the offenses were committed while he bathed the young girls. The Defendant testified that he attended the victims while they were in the bathtub in order to "lifeguard" them. The proof at the trial established that the Defendant told the victims that the abuse was a secret. The evidence supports the trial court's application of the factor. See, e.g., State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993) ("The factor can be used in an aggravated rape case if the circumstances show that the victim, because of his age or physical or mental condition, was in fact "particularly vulnerable," i.e., incapable of resisting, summoning help, or testifying against the perpetrator."). The Defendant is not entitled to relief on this basis.

## B. Consecutive Sentences

With regard to the court's imposition of partially consecutive sentences, the determination of concurrent or consecutive sentences is a matter left to the discretion of the trial court and should not be disturbed on appeal absent an abuse of discretion. State v. Blouvet, 965 S.W.2d 489, 495 (Tenn. Crim. App. 1997). Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b) (2010), which states in pertinent part

that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that:

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Only one criterion is needed to support consecutive sentences. State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

The record reflects that the Defendant's convictions involve more than one victim. The trial court considered the factors listed in section 40-35-115(b)(5) and concluded that the aggravating circumstances of the relationship between the Defendant and the victims and the residual harm to the victims outweighed the less aggravating evidence of the time span of the activity and the nature and scope of the sexual acts. The evidence supports the trial court's ruling. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed in Counts V, VI, VII, IX, and X. The judgments in Counts I, II, III, and IV are reversed, and the case is remanded for a new trial for those counts.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE